## Case No. 14,630.

### UNITED STATES v. BOWERMAN.

[14 Int. Rev. Rec. 122.]

District Court, D. Maryland. Oct. 7, 1871.

EMBEZZLEMENT BY PUBLIC OFFICERS—DEPUTY COLLECTORS.

[1. A deputy collector is a "public officer," within the meaning of the subtreasury act of 1846, relating to the embezzlement by public officers of public moneys entrusted to them.]

[2. Sums of money paid to a deputy collector at the custom house by inspectors of hulls and engines, as money received by them from engineers and pilots under the act of 1852, as well as the proceeds of the sale of goods forfeited to the government under the revenue laws, are "public moneys," within the meaning of the said statute.]

The trial of Richard N. Bowerman, late deputy collector of customs at Baltimore, on the charge of embezzlement, was commenced in that city on Wednesday, September 27, and concluded October 7 with a verdict of guilty on the part of the jury. The indictment contained five counts, the first one charging the accused with embezzling the funds of the government to the amount of $25,000, but failing to specify in what amounts and at what particular periods the defalcations were made. The second count charged him with appropriating to his own use, in July, 1870, the sum of $50, collected from John Menshaw, supervising inspector of steamboats. The third count charged him with appropriating the sum of $996, collected in March, 1870, as receipts of customs. The fourth count charged him with appropriating $180, collected in June, 1870, from Wm. O. Saville, of the local board of steamboat inspectors, and the fifth count with appropriating $294, collected in November, 1869, from John C. Hill, superintendent of public buildings. The defence objected, at the outset, to the indictment on the ground that it makes a charge of embezzlement without alleging from whom the money was received, and that the defence was at the mercy of the prosecution, and that the drawing up of the indictment debarred the prisoner from a chance of defence. This objection was overruled as coming too late.

A written statement was presented from John L. Thomas, collector, giving the particulars of his examination into the defalcations of the accused. He reported that he found that General R. N. Bowerman had taken a check from the back part of his gold check book (leaving no stub or margin), numbered it 72, dated June 2, 1869, and made payable to F. W. Brune & Sons, "or bearer," for $5,800, said check endorsed on its face by T. H. H. Leary, cashier of the depositary. This check was used by Gustav Toel, attorney for Messrs. F. W. Brune & Sons, on that day, in part payment of the duty on one hundred and fifty hogshead of sugar imported by them in the brig Sarah Crowell. Said sugar was drawn from warehouse on the 15th day of June, 1868, nearly twelve months before the

duty was paid. He also found that General Bowerman had received on adjustments of entries of copper ore imported into this port by the Baltimore Copper Company, Henry Martin, president, which he has not deposited with the cashier of customs of the port of Baltimore, between the 3d day of May, 1860, and the 3d day of June, 1870, $1,888 44. In the revenue marine account, eleven checks, amounting in all to $1,195 24, were found, signed by General Bowerman, special deputy collector, for which there are no vouchers; in the light-house account, eleven, amounting to $5,347 25. In the collector's account were found checks to the amount of $1,215 06, signed by General Bowerman, which were used to pay storekeepers during the months of May and June, 1869, for which there are no vouchers in this account. This amount was collected from proprietors of private bonded warehouses during those months, and has never been deposited to the credit of the storage account. Twenty-two other checks, for which there were no vouchers, were found, amounting to $4,509 69. Various other defalcations are also reported by the collector. At the close of the proceedings of the first day the bail of General Bowerman was surrendered, and the court not agreeing to permit the accused to remain under the surveillance of a bailiff until the close of the trial, ordered his committal to jail.

Mr. Thomas, the collector, in his testimony before the jury, stated the manner in which he became possessed of the papers implicating General Bowerman. In substance he said that while General Bowerman was absent on an excursion that he (witness) took charge of the desk and an iron safe used by the accused, and upon forcing open the doors of the safe he found in it a small tin box filled with papers, and he also obtained a quantity of papers from the desk. These papers were taken into the private office of the witness and there examined, and among them was a large bundle of warehouse entries showing that a vast quantity of copper ore that had been entered at the custom-house had not been properly accounted for by the accused. After he had examined the papers found in the safe and desk, he had placed them in the custody of Alexander Miller and Charles E. Suter, with instructions for them to examine into all the acts of General Bowerman from the date of his commission until the time he was removed. This occurred while General Bowerman was absent on a visit down the bay, and when he (General B.) returned to the city, Mr. Miller and Suter had ascertained that the defalcation amounted to upwards of $20,000. When General Bowerman arrived in the city he was requested by witness to call at his house. He complied with the request; and after attempting at first to explain the irregularities in his accounts, finally began crying, and said: "Mr. Thomas, I will make no concealment from you; I have abused your confidence, and all that you have charged against me is true." Mr. Thomas then at considerable length stated, as far as he was able, the exact conversation had between himself and General Bowerman, and which in substance is as follows: When asked what he had done with the embezzled money, General B. said that he had spent every dollar of it. The $1,120 drawn from the light-house check was deposited by him with the cashier of customs for the purpose of covering up a defalcation in that quarter. He acknowledged that his defalcations would amount to $14,000, and Mr. Thomas would be held responsible for the amount. He admitted that his peculations began shortly after he was appointed by Collector Webster, and continued until the day of his detection, and that which has been embezzled since Mr. Thomas has been collector has been used to cover up the defalcations made in Colonel Webster's time. He stated that following the induction of Collector Thomas into office, by a misrepresentation he caused Mr. Thomas to sign a special deposit for $500, asserting that the money had been collected from a fine. The fine had never been collected and the money was used by the accused. General Bowerman then said to Mr. Thomas: "I will do anything to relieve you of the responsibility that I have imposed upon you, and all I ask is that I may help you." Referring to the defalcation in general, he admitted that he had appropriated dues collected for the entries of copper ore and goods sold, and that he would induce his wife to make over her property to Mr. Thomas in part liquidation of the defalcation. To this tender Mr. Thomas answered that it would be a hard case to impoverish a wife for the misdeeds of a husband, but that as the government had demanded from him the amount of the defalcation, he (Mr. T.) would have to secure himself and accept the tender of property. After this conversation General Bowerman requested permission to go to his home, promising Mr. Thomas that he would report himself at the custom-house at eight o'clock on the following morning. To this Mr. Thomas consented, and on the following morning General Bowerman reported at the custom-house as promised. After stating the above, Mr. Thomas requested leave to relate other conversation which ensued, and which he had failed to make mention of at the proper time. It was to the effect that General Bowerman admitted that, in 1868, he used for his own benefit about $5,000, collected from F. W. Brune & Bro. as duties on sugar. Other admissions of guilt were made by General Bowerman.

The United States prayed the court to instruct the jury that if they shall find from the testimony that the prisoner heretofore (as given in evidence) was a deputy collector of the customs for the customs district of Baltimore, and that then and while he was such deputy received the several sums charged in the first four counts of the indictment—that is to say, the sum of $1,120 effectively char-

ged in the first count, and the several sums charged and specified in the second, third, and fourth counts—or any of said sums, or portions thereof, and that he thereupon converted the same to his own use in any manner whatever, then they shall find the prisoner guilty of the counts or count in respect to which they find such reception and conversion. That if the jury shall believe from the evidence that the prisoner was, at the time of the offences charged in the first, third, and fourth counts of the indictment, deputy collector of the customs for the customs district of Baltimore, then he was a receiver of public money within the intent of the acts of congress in the indictment mentioned; and if the jury shall find the several sums charged in the said counts to have been received by him and embezzled were in truth and fact received by him as such deputy collector of the customs, and were afterward by him in any manner whatever converted to his own use, then he is guilty of embezzlement in respect to the count or counts in respect whereof they may find such embezzlement. If the jury shall find the prisoner guilty of one or more counts of the indictment, then they shall ascertain what amount of money appertaining to the sum or sums in the said count or counts charged the prisoner in fact embezzled. That if the jury shall find that the prisoner drew the check under the first count given in evidence, and used the proceeds thereof to cover up a fraudulent indebtedness of him to the government, then he is guilty of the embezzlement of such proceeds in like manner as if he had appropriated said proceeds to any other use.

The prayers of the defence were as follows: The government having offered in evidence the appointment and commission of the defendant as special deputy collector under and by virtue of the act of 1799, § 22, as well as his nomination and appointment as deputy collector under and by virtue of the provisions of the act of 1817, § 9, and having alleged in the indictment and the several counts thereof that at the time of the alleged commission of the several acts of embezzlement, respectively, therein set forth that the said defendant was authorized to act and was acting as special deputy collector, the defendant prays the court to instruct the jury that the burden of proof, by reason of the premises, is upon the government to satisfy their minds as a matter of fact that, at the time and times of the alleged embezzlement or embezzlements set forth in the respective counts of the said indictment, the defendant was acting as special deputy collector on account of the necessary absence or sickness of the said collector and not otherwise, and that unless their minds are satisfied of such fact by proper proof, then their verdict must be for the defendant. If the jury shall find, from all the evidence in this cause, that the defendant was an officer of the United States, charged by the act of congress of August 6,

1846, mentioned in the indictment, with the safe-keeping, transferring, and disbursement of the public moneys, then, in order to their rendering of the verdict of guilty upon either or any of the several counts of the said indictment, they must further find that the money alleged to have been by him embezzled, as set forth in each and every respective count of said indictment, was public money of the United States, and that the same came into his hands in the ordinary and regular line of his duty, and was by him converted to his own use, with intent to defraud the government of the United States. That, in considering the first count in the indictment, the jury are limited to the sum of eleven hundred and twenty dollars, alleged to have been embezzled on the 22d day of September, 1869, and cannot take into consideration any other sum or sums of money alleged to have been embezzled at any other time or times. That the burden of proof is on the government to satisfy the jury that the defendant did receive and feloniously did take and convert to his own use the public money set forth in either counts of the indictment in order to warrant a verdict of guilty upon such counts. That the defendant at the time or times named in the indictment was not an officer or person charged by the act of August 6, 1846, with the safe-keeping, transfer, and disbursement of the public money.

GILES, District Judge (charging jury). I think I but say what every person who has been a witness of this trial will unite with me in saying, that no case was ever more faithfully tried: the indictment was drawn up with all the care and skill which characterizes the assistant United States district attorney, of whose indictments I have quashed but one of the many which he has drawn while serving the government in that office. As to this district, no matter what may be the fact elsewhere, this case is one of first importance (for the employees of the government for this district have been, so far as known, faithful officers), and hence it required careful consideration. Never since I have been on the bench has a prisoner been defended more ably; the learned counsel who last addressed the court (Mr. Mathews) has exhibited throughout this cause eminent ability, an ample preparation and a careful industry, which, if persevered in, must soon place him in the front rank of the profession: certainly the force and qualities which he has shown have proved him to be a worthy colleague of the other counsel (Mr. Whitney), in regard to whose characteristics in criminal cases it is unnecessary for the court to add one word of praise. He dissects a criminal case with the same coolness and skill with which Baron Larey or Surgeon Smith of this city would use the dissecting knife upon a patient strapped to his board. This case then being one of such great interest I have examined the

points involved in it with great care. The first question that arises is, "Was the prisoner an officer within the meaning of the act of 1846?" The learned counsel for the defence pressed the argument that he was not such an officer as would come under the provisions of that act, but a mere employee of the custom-house, with great earnestness, and to sustain it they quoted the act of 1799 and from the Opinions of the Attorneys-General (volume 4, p. 26); but I said then as I say to-day, that if any attorney-general had given such an opinion, in view of the act of 1817, that it was not law, and I found upon examination last night that no such position had been taken by Mr. Legare, of South Carolina, whose opinion my friends referred to, and that they must have been misled by reading the headnote, for that opinion of his was based upon the 22d section of the act of 1799, and he says nothing in it of the act of 1817, and no doubt was not aware of it at the time. If my friends had read on a little further they would have found that upon page 163 that eminent attorney-general sustains me in the opinion I shall deliver to-day. Before quoting this opinion, however, I will say that I find upon reference to the acts of congress that the act giving the power to collectors to appoint inspectors is in the very words of the act of 1817, which gives him power to appoint deputies.

GILES, District Judge, then read from the act (3 Stat. 215), calling Mr. Whitney's attention to the fact that the word used was "employ," and not "appoint," after which he quoted at length from the opinion, which was in the form of a letter addressed to the secretary of the treasury, dated March 24, 1843, in relation to the character of inspectors, and which held that they were officers of the government, and came under the act of 1846. Then resuming, he said: Now, the act of 1817 gave this permanent power to the collector, and congress provided afterward an annual compensation for the officer, by the act of 1851. Therefore I look upon the deputy collector as a permanent officer of the government, who obtains his appointment from the secretary of the treasury, and remains in office after his superior goes out, until his (the deputy's) successor is appointed and qualified. But is he an officer within the meaning of the subtreasury act (the act of 1846)?

The judge then read the sixth section of the act, calling special attention to the general words used in it: "All public officers of whatsoever kind." These words embrace, said he, any officer of the government in whose possession the public funds may at any time be deposited, in whatever manner they be so deposited, and the sixteenth section declares it to be a felony for these officers to embezzle these funds. Now, this act makes it the duty of certain officers to keep accounts with the government, and afterward makes these accounts prima facie evidence against them on a charge like this; but it would be doing violence to the language of congress to suppose that this act was confined only to those officers who have to keep accounts with the government. I should myself have had no difficulty upon this point if it had been a new question, and should have arrived at a different conclusion upon it than the judges in Philadelphia; but it is not a new question, and I am bound by the decision of the supreme court in the case of U. S. v. Hartwell, 6 Wall. [73 U. S.] 385, and no one can have any doubt after that decision. The officer tried in that case stood upon the same footing as a deputy collector; he was appointed under the 23d section of the act of 1866; and the supreme court says he was a public officer, and a person charged with the safe-keeping of the public money. The judge then read from the opinion of the court, and showed where it applied to the case at bar. I am aware, said he, that Justice Grier, with two others, dissented, but the opinion of the majority, delivered by Justice Swayne, binds this court, and I have no doubt from it that the deputy collector is an officer who comes under the act of 1846.

I now come to another branch of the case, and the only one upon which the United States district attorney and myself differed. Here I agree with the counsel for the defence, that before there can be an embezzlement there must be trust and confidence; so says the act—"moneys entrusted." Hence I permitted the district attorney to give evidence of what the practice of the office had been at the time as to the fact that the deputy collector was permitted to receive the public money, and that as a public officer he was therefore entrusted with it.

One word more: There was some objection made to the indictment, that it charges that these offences were done by General B. both as a deputy collector and a special deputy; but that part of it is only descriptive and not material. The charging part does not charge him in both capacities.

One word, in conclusion: Something has been said in reference to the manner in which the affairs of the custom-house were conducted while the prisoner was there. All I can see, from the evidence, as to what the collector did, was that he placed unlimited confidence in a man who had bared his breast for his country in the shock of battle, and defended its flag amidst its smoke. This was a fault that we all might have fallen into.

GILES, District Judge, then read the instructions to the jury: "First. If the jury shall find from the evidence in the case that at the time of the alleged embezzlement of the several sums given in the evidence the prisoner was a deputy collector in the office of the collector of this port, and as such received the said sums of money, and so received them in furtherance of a practice then prevailing in said office, and that he subsequently converted them to his own use, he is

guilty upon the second, third, and fourth counts in the indictment, or under any one or more of them in respect to which the jury shall find such reception and conversion. Second. And if they shall further find that in pursuance of the said office he was authorized to draw checks on the depositary for the disbursements of the office, and that as such deputy collector he drew the check given in evidence under the first count, and appropriated the same to cover a similar amount of the public money unlawfully used by him, he is guilty of embezzlement under said count. Third. That when any sum or sums of money were paid by the inspectors of hulls and engines as money by them received from engineers and pilots, under the act of 1852, and proceeds of the sale of goods forfeited to the government under the revenue laws are paid at the custom-house to the deputy collector. the said sums are public moneys, within the meaning of the act of 1846, under which the indictment is drawn. Fourth. That in considering the first count in the indictment the jury are limited to the sum of $1,120 alleged to have been embezzled on the 22d of September, 1869. and cannot take into consideration any other sum or sums alleged to have been embezzled at any other time or times, except as the jury may find such alleged embezzlement may be evidence of the intent with which the prisoner drew and used the check for the said sum of $1,120. Fifth. That the burden of proof is on the government to satisfy the jury that the prisoner did receive and convert to his own use the public moneys set forth in the several counts in the indictment, in order to warrant a verdict of guilty upon one or more of said counts."

Subsequently, GILES, District Judge, gave the following additional instruction to the jury: "There being no evidence to sustain the fifth count in the indictment, the jury will acquit the prisoner under the count. If the jury shall find him guilty under any of the other counts, they will by their verdict ascertain the amount embezzled under such count."

The jury returned a verdict of "Guilty" upon the first count, as to the sum of $1,120; upon the second count, as to $996.72; upon the third count, as to $50; and upon the fourth count, as to $180. Upon the fifth count, "Not guilty." The verdict was recorded, and the court adjourned until this morning. After the adjournment, GILES, District Judge, said that sentence would be suspended until after the trial of the other cases, and that the case of the United States v. Colonel Wilson had been set for trial on the 16th, and the case of the United States v. Smyth for trial on the 17th. The penalty for the offence of which General Bowerman has been convicted is imprisonment for not less than six months nor more than ten years in the jail or penitentiary, as the court may direct. and a fine of double the amount of the verdict of the jury.